UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE TRAVELERS INDEMNITY CO., <br><br> Plaintiff, <br><br> v. <br><br> SHERMAN BRONSINK, et al., <br><br> Defendants. | CASE NO. C08-1524JLR <br><br> ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the court on the cross-motions for summary judgment of Plaintiff The Travelers Indemnity Company ("Travelers") and Defendant Sherman Bronsink. Travelers' motion for partial summary judgment (Dkt. # 15) seeks a determination that Mr. Bronsink canceled the insurance policy he purchased from Travelers and that, as a result, the losses Mr. Bronsink suffered when a building he owned burned down are not covered by the policy. Mr. Bronsink's motion for summary judgment (Dkt. # 23) and cross-motions for summary judgment (Dkt. # 33) seek a

ORDER- 1

determination that the Travelers policy was in effect at the time of the fire. The parties have not requested oral argument. Having considered the submissions of the parties, and for the reasons set forth below, the court GRANTS Travelers' motion for summary judgment (Dkt. # 15) and DENIES Mr. Bronsink's motion for summary judgment (Dkt. # 23) and cross-motions for summary judgment (Dkt. # 33).

## I. BACKGROUND

On June 9, 2008, Delft Square, a commercial building owned by Mr. Bronsink, was destroyed in a fire. The issue in this case is whether an insurance policy Mr. Bronsink purchased from Travelers was in effect when the building burned down. The parties do not dispute the basic facts.

Mr. Bronsink contracted with a property management firm, Pacific Continental Realty ("PCR"), to manage Delft Square. (Declaration of Sherman Bronsink ("Bronsink Decl.") (Dkt # 24) ¶ 2.) One of the services that PCR provided was to pay the insurance bills for Delft Square. (Declaration of James T. Derrig ("Derrig Decl.") (Dkt. # 20), Ex. 2 (Deposition of Jim Bjerke) ("Bjerke Dep.") 11:5-13.[1]) To insure Delft Square, Mr. Bronsink worked with the Rice Insurance Agency ("Rice"), which insured the building with a commercial property insurance policy provided by Travelers (the "Policy"). (Declaration of Greg Gudbranson ("Gudbranson Decl.") (Dkt. # 17) ¶ 2.) Mr. Bronsink first insured Delft Square through Travelers for the policy year June 1, 2003, to June 1,

---

[1] Travelers' memorandum in support of its motion for summary judgment refers to pages of depositions by ECF number. The court, however, refers to the transcript page numbers for ease of reference by both parties.

2004, and renewed the Policy annually thereafter. (Bronsink Decl. ¶ 3.) The named insured on the Policy was "Sherman Bronsink DBA: Delft Square." (*See* Declaration of Kevin Brown ("Brown Decl.") (Dkt. # 16), Ex. 1, at 8.) Although the premiums on the Policy were due on the first day of each policy year, PCR paid the premiums a few days late each time. (Declaration of Gretchen Graham Salazar ("Salazar Decl.") (Dkt. # 26), Ex. K (Deposition of Elizabeth Lochte) ("Lochte Dep.") 46:5-47:20.)

On May 12, 2008, Travelers issued an Account Bill for renewal of the Delft Square Policy for the policy year June 1, 2008, through June 1, 2009 ("Account Bill"). (Declaration of Cherri Robertson ("Robertson Decl.") (Dkt. # 25), Ex. B.) The total balance due on the Policy was $11,225.00, and the minimum amount due was $2,812.25. (*Id.*) The Account Bill stated that payment "must be received by" June 1, 2008. (*Id.*) Under the heading "Special Messages," the Account Bill stated: "You must pay at least the minimum due or up to the total balance due. . . . If your payment is not received by the due date a late fee of $10.00 might be assessed to your next bill." (*Id.*) Travelers' proposed renewal policy included a limit of $3,990,000.00 for property coverage for the policy year June 1, 2008, to June 1, 2009, at an annual premium of $10,690.00.[2] (Brown Decl., Ex. 1 at 8, 18.) Rice forwarded the bill and the proposed renewal policy to Mr. Bronsink at PCR. (Robertson Decl. ¶¶ 2, 3.) PCR received the Account Bill on May 15, 2008, and the proposed renewal policy on May 20, 2008. (*Id.*)

---

[2] Mr. Bronsink's "umbrella" liability policy for Delft Square was also included on the Account Bill. (*Id.*) The umbrella policy is not at issue in this case.

ORDER- 3

Mr. Bronsink thought that the Travelers Policy was expensive. (Derrig Decl, Ex. 1 (Deposition of Sherman Bronsink) ("Bronsink Dep.") 25:19-26:1.) Seeking a better value, Mr. Bronsink contacted Dale Hendricks, an agent at Oltman Insurance ("Oltman"), and negotiated a new insurance policy through Mutual of Enumclaw Insurance Company ("Mutual of Enumclaw"). (Bronsink Decl. ¶¶ 5-6.) The Mutual of Enumclaw policy included a limit of $2,900,000.00 for coverage on the Delft Square building, at an annual premium of $4,716.00. (Derrig Decl., Ex. 4 at 93, 95.) Mr. Bronsink contends that he intended to maintain both the Travelers Policy and the Mutual of Enumclaw policy for one month so that he could compare the coverage and value that each policy provided. (Bronsink Decl. ¶ 6.) He admits, however, that he never told anyone that this was his intent. (Bronsink Dep. at 35:9-13.)

On May 29, 2008, Mr. Bronsink gave Mr. Hendricks the go-ahead to obtain the Mutual of Enumclaw policy. (Bronsink Decl. ¶ 8.) On the same day, at the request of Cherri Robertson, PCR's accounting manager, Mr. Bronsink signed a document titled "Cancellation Request/Policy Release" ("Policy Release").[3] (Brown Decl., Ex. 3; *see also* Bronsink Dep. 36:18-37:10.) Ms. Robertson signed the Policy Release as a witness. (Brown Decl., Ex. 3; Robertson Decl. ¶ 1.) The Policy Release identified Delft Square as the insured, stated the policy number for the Travelers Policy, and specified a

---

[3] Mr. Bronsink contends that he was in a hurry when Ms. Robertson gave him the Policy Release to sign and that he did not read it. (Bronsink Decl ¶¶ 9, 10.) He states that had he known it was a cancellation request, he would not have signed it. (*Id.* ¶ 10.)

ORDER- 4

cancellation date of June 1, 2008. (Brown Decl., Ex. 3.) The Policy Release also included the following language:

> The undersigned agrees that:
>
> > The above-referenced policy is lost, destroyed, or being retained.
> >
> > No claims of any type will be made against the Insurance Company, its agents or its representatives, under the policy for losses which occur after the date of cancellation shown above.
> >
> > A premium adjustment will be made in accordance with the terms and conditions of the policy.

(*Id.*) The parties dispute both the date that PCR mailed the Policy Release and the date that Travelers received it. (*See* Bronsink Resp. (Dkt. # 33) at 14-15.) Regardless, after Travelers' Seattle office received the Policy Release, it forwarded the Policy Release to its processing center in Spokane. (Declaration of Elizabeth Lochte ("Lochte Decl.") (Dkt # 19) ¶ 2.)[4]

On May 30, 2008, PCR issued a check to Mutual of Enumclaw as payment on Mr. Bronsink's new insurance policy. (Brown Decl., Ex. 5 at 98.) Neither Mr. Bronsink nor PCR notified Rice that Mr. Bronsink had obtained the Mutual of Enumclaw policy. (Gudbranson Decl. ¶ 4.)

---

[4] Mr. Bronsink moves to strike the Declaration of Elizabeth Lochte. (Bronsink Resp. at 20-22.) Bronsink contends that Ms. Lochte lacks personal knowledge to testify regarding the facts to which she attests. The court denies the motion to strike paragraphs 1 and 3 as the court finds that Ms. Lochte's declaration establishes that she has the requisite personal knowledge to testify as to how Travelers generally processes policy cancellations. The court declines to rule on the motion to strike paragraph 2 because the court did not rely on this paragraph in deciding this motion.

ORDER- 5

On the afternoon of June 9, 2008, a fire destroyed Delft Square. (Bronsink Dep. at 13:9-18.) The fire was large enough to attract local television coverage. (Gudbranson Decl. ¶ 5.) When a Rice agent saw the Delft Square fire on the news, he called Travelers and put it on notice of a pending claim. (*Id.*)

Travelers initially assigned Natalie Hughes as adjuster for the Delft Square loss. (Brown Decl. ¶¶ 1, 2.) On June 10, 2008, the day after the fire, Ms. Hughes learned that Delft Square was insured by Mutual of Enumclaw and that there was a "signed letter" canceling the Travelers coverage. (Brown Decl., Ex. 14.) Ms. Hughes informed Greg Gudbranson, a Rice agent, that Delft Square was insured by Mutual of Enumclaw. (Gudbranson Decl. ¶ 7.) Surprised by this news, Mr. Gudbranson called Mr. Hendricks, the Oltman agent, who confirmed that Mr. Bronsink had insured the building through Mutual of Enumclaw and that Ms. Robertson of PCR had handled the Policy Release. (*Id.*) On June 11, 2008, Travelers reassigned the matter to Kevin Brown, an adjuster with Travelers' property major case unit. (Brown Decl. ¶ 1, 2.)

Meanwhile, Mr. Bronsink and PCR began to deal with the loss of Delft Square. On June 10, 2008, PCR issued a check to Travelers for $2,812.25, the minimum payment specified on the Account Bill. (Robertson Decl. ¶ 4.) PCR sent the check via overnight mail to Travelers' home office in Hartford, Connecticut, where it was received on June 11, 2008. (*Id.*) On June 11, 2008, Mr. Bronsink hired Masood Khan, a public adjuster and attorney, to oversee his insurance claims. (Declaration of Masood Khan ("Khan Decl.") (Dkt. # 28) ¶ 3.)

Mr. Khan met with Mr. Brown on June 12, 2008. (*Id.* ¶ 4; Brown Decl. ¶ 7.) At this meeting, Mr. Brown informed Mr. Khan that he had learned of the existence of the Policy Release, but that he did not have a copy. (Khan Decl. ¶ 5; Brown Decl. ¶ 7.) When Mr. Brown asked Mr. Khan to provide a copy of the Policy Release, Mr. Khan replied that he was unaware of the release and did not have it in his possession. (Khan Decl. ¶ 5.)

On June 14, 2008, PCR received a Notice of Cancellation for Non-Payment of Premium ("Notice of Cancellation") for Mr. Bronsink's Travelers account. (Robertson Decl. ¶ 5.) Travelers' billing system in Virginia automatically generated the Notice of Cancellation on June 11, 2008, because Mr. Bronsink had not paid the Account Bill within 10 days of its due date. (Declaration of Phyllis Kofman ("Kofman Decl.") (Dkt. # 18) ¶ 2.) The Notice of Cancellation stated that the effective date of cancellation of Mr. Bronsink's Travelers Policy would be July 1, 2008, and that Travelers would reinstate the Policy effective June 1, 2008, if Mr. Bronsink paid a minimum payment of $3,563.53 before July 1, 2008. (Robertson Decl., Ex. D at 2.) On June 17, 2008, in response to the Notice of Cancellation, PCR sent Travelers a second check, this time for $3,763.66. (Robertson Decl. ¶ 6.) Travelers deposited the check.[5] (*Id.*)

On June 19, 2008, PCR received a Reinstatement Notice from Travelers. (Robertson Decl. ¶ 7.) The Reinstatement Notice stated, "We are pleased to tell you that

---

[5] On July 11, 2008, PCR issued a third check to Travelers, this time for $4,659.09, the remaining balance due on the Policy for the coverage year June 1, 2008 to June 1, 2009. (Robertson Decl. ¶ 8.)

ORDER- 7

your policy has been reinstated." (*Id.*, Ex. F.) This notice was automatically generated by Travelers' billing system on June 16, 2008, after Travelers' Connecticut office processed Mr. Bronsink's June 10, 2008 check. (Kofman Decl. ¶ 3.)

In the meantime, the adjustment process for Mr. Bronsink's Delft Square claims continued. On June 23, 2008, Mr. Brown requested from Mr. Khan "all documents pertaining to the cancellation of the Travelers policy." (Brown Decl., Ex. 6.) Mr. Khan produced copies of a number of documents, including the checks Mr. Bronsink sent to Travelers and the Reinstatement Notice. (*Id.*, Ex. 7.) Mr. Khan did not, however, include a copy of the Policy Release, nor did he include an email sent by Jim Bjerke, the head of PCR, to Mr. Khan on June 12, 2008, which stated:

> Dale at Oltman has put a note in the file to not share the termination notice with anyone. Mary, his mail person has been informed to hold the mail should the notice be returned. She thinks it was put into a standard envelope to Travelers, but does not remember for sure.

(Derrig Decl., Ex. 7.)

On July 8, 2008, Mr. Brown emailed Mr. Khan and again asked about the Policy Release. (Brown Decl., Ex. 11.) Mr. Khan replied that neither he nor Mr. Bronsink had "a letter requesting cancellation of the Travelers policy." (*Id.*) Mr. Khan added,

> It is our understanding that no letter requesting cancellation of the Travelers policy was ever sent, forwarded, or delivered to Travelers. Even if one was prepared, which it was not, it has no legal effect on Travelers' contractual obligation to extend coverage for the fire loss.

(*Id.*)

While the adjusters attempted to determine whether and to what extent the Travelers Policy would cover Mr. Bronsink's losses, Travelers continued to investigate

ORDER- 8

the fire loss. (Brown Decl. ¶ 2.) Travelers also agreed to share certain costs with Mutual of Enumclaw, including the cost to hire a structural engineer to assess the damage to the building and the cost of emergency repairs required to shore up the damaged building. (*Id.*) Between June 10, 2008, and October 17, 2008, Travelers spent over $90,000.00 on the Delft Square claim. (*Id.*)

In late July 2008, Heidi Peters, an employee at Travelers' Spokane office, was about to enter the Policy Release into Travelers' processing system when she realized that the form was missing the policy term. (Salazar Decl., Ex. J (Deposition of Heidi Peters) ("Peters Dep.") 7:20-9:4.) Ms. Peters called Mr. Gudbranson, the Rice agent, to ask him for the missing information. (*Id.*) Mr. Gudbranson told Ms. Peters that the Travelers underwriter in Seattle was looking for the form. (*Id.*) Ms. Peters faxed the Policy Release to Travelers' Seattle office on July 29, 2008. (*Id.* 9:16-21.)

Travelers took Mr. Bronsink's examination under oath and questioned him about the Policy Release. (Brown Decl. Ex. 13.) Mr. Bronsink admitted that he had signed the Policy Release. (*See id.*) On October 17, 2008, Travelers issued a letter denying coverage for the Delft Square fire and refunded Mr. Bronsink's premiums. (*Id.*)

## II. ANALYSIS

**A.  Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates that "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los*

*Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no material factual dispute and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**B.  Governing Law**

Washington follows the objective theory of contracts, which focuses on the objective manifestations of the agreement.[6] *Hearst Comm'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). Thus, in interpreting a contract, a Washington court will "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than the unexpressed subjective intent of the parties." *Id.*

Under Washington law, interpretation of an insurance policy is a question of law for the court. *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). The court should give the terms of the policy a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Id.* (internal quotation omitted). Terms defined within a policy are to be construed as defined, while undefined terms are given their ordinary meaning. *Boeing Co. v. Aetna Cas. & Sur. Co.*,

---

[6] The parties agree that Washington law governs their dispute.

ORDER- 10

784 P.2d 507, 511 (Wash. 1990). If the policy language on its face is fairly susceptible to two different and reasonable interpretations, ambiguity exists, and the court must apply the interpretation most favorable to the insured. *Allstate Ins. Co. v. Peasley*, 932 P.2d 1244, 1246-47 (Wash. 1997) (cited in *Petersen-Gonzales v. Garcia*, 86 P.3d 210 (Wash. Ct. App. 2004)).

**C.  The Policy Release was effective to release Travelers from claims under the Policy**

Travelers' primary argument in support of its motion for summary judgment is that Mr. Bronsink cancelled the Policy and released Travelers from all claims arising after June 1, 2008, by signing the Policy Release and delivering it to Travelers. (Travelers Memorandum (Dkt. # 21) at 13-14.)

Under Washington law, an insured has the right to cancel an insurance policy. Specifically, "cancellation by the insured of any policy which by its terms is cancellable at the insured's option . . . may be effected by written notice thereof to the insurer . . . prior to or on the effective date of such cancellation." RCW 48.18.300(1). The Policy is consistent with the statute, and provides that "[t]he first named insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation." (Brown Decl., Ex. 1 at 11 ¶ A(1).) Washington law also provides that absent fraud, deceit, or coercion, "a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents." *Skagit State Bank v. Rasmussen*, 745 P.2d 37, 39 (Wash. 1987) (quoting *Natl. Bank of Wash. v. Equity Investors*, 506 P.2d 20, 36 (Wash. 1973)).

ORDER- 11

1  Here, the undisputed facts establish that the Policy Release met the statutory and
2  contractual requirements for an effective cancellation by the insured.  First, it is
3  undisputed that the Policy Release was in writing and was signed by Mr. Bronsink, the
4  named insured.  (Brown Decl., Ex. 3.)  Although Mr. Bronsink contends that he did not
5  read the Policy Release before signing, he has not suggested that he signed as a result of
6  fraud, deceit, or coercion; he is, therefore, bound by his signature under Washington law.
7  *Skagit State Bank*, 745 P.2d at 39.  Second, the Policy Release clearly identified the
8  policy to be cancelled by its policy number.  (*Id.*)  Third, the Policy Release expressly
9  stated a cancellation date of June 1, 2008.  (*Id.*)  Finally, although the parties dispute the
10 *date* of delivery, they do not dispute the *fact* that the Policy Release was delivered to
11 Travelers.  (*See* Bronsink Reply (Dkt. # 40) at 5.)  The Policy Release thus met both the
12 contractual requirements stated in the Policy and the statutory requirements under
13 Washington law.  Although it is true that the policy period was not included on the Policy
14 Release, neither the statute nor the Policy requires that information.  In addition, the
15 Policy Release contains express unambiguous language stating that "no claims of any
16 type will be made against the Insurance Company, its agents or representatives under the
17 policy for losses which occur after the date of cancellation shown above." (Brown Decl.,
18 Ex. 3.)  Thus, by signing the Policy Release, Mr. Bronsink expressly agreed not to hold
19 Travelers liable for coverage of any losses occurring after June 1, 2008.  The court
20 therefore holds that the Policy Release was effective to release Travelers from any claims
21 that Mr. Bronsink may have made after June 1, 2008, including any claim for the losses
22 Mr. Bronsink suffered in the Delft Square fire on June 9, 2008.

Mr. Bronsink raises a number of arguments in his effort to establish that the court cannot hold as a matter of law that the Policy Release was effective to release his claims against the Travelers Policy. His arguments are not persuasive.

First, Mr. Bronsink contends that the court cannot hold as a matter of law that the Policy Release was effective to release Travelers from claims relating to the Delft Square fire because the undisputed evidence does not establish that Travelers received the Policy Release before June 9, 2008. (Bronsink Resp. (Dkt. # 33) at 12-16.) Mr. Bronsink cites a number of cases from outside of Washington to support his assertion that an insured's written notice of cancellation does not go into effect until the day that the agency receives the notice. (*Id.* at 12-13.) The court has reviewed Mr. Bronsink's cited cases and does not find them persuasive, particularly in light of the unambiguous language of the signed Policy Release, which states that Mr. Bronsink agreed not make any claims against the Travelers Policy for losses occurring after June 1, 2008. (Brown Decl., Ex. 3.) None of Mr. Bronsink's cited cases involve an insured's cancellation notice that (1) stated an effective cancellation date and (2) expressly released the insurer from claims arising after that date. (*See* Bronsink Resp. at 12-13.) The court therefore finds no reason to depart from the express language of the Policy Release.

Second, Mr. Bronsink contends that the Policy Release is ineffective because Travelers failed to process it. (*Id.* at 15-16.) In Washington, however, the insured unilaterally cancels an insurance policy when he or she sends a cancellation notice. Although the insurer may need to take some administrative acts in order to close the insurance account, the insured effects the "real cancellation" of the policy. *Higgins v.*

ORDER- 13

*Scottsdale Ins. Co.*, 111 P.3d 893, 897 (Wash. Ct. App. 2005). Other jurisdictions are in accord. *See, e.g.*, *Coe v. Farmers New World Life Ins. Co.*, 257 Cal. Rptr. 411, 414-416 (Cal. Ct. App. 1989) (discussing multiple cases that hold that cancellation of an insurance policy by the insured requires no action by the insurer).

Third, Mr. Bronsink argues that even if Travelers received the Policy Release before June 9, 2008, Travelers waived the Policy Release when it accepted Mr. Bronsink's late premium payment and sent the Reinstatement Notice. (Bronsink Resp. at 16-17.) This argument, too, is unavailing. "The doctrine of waiver requires a showing that the insurer has voluntarily and intentionally relinquished a known right or that its conduct warrants an inference of the relinquishment of such right." *James E. Torina Fine Homes, Inc., v. Mutual of Enumclaw Ins. Co.*, 74 P.3d 648, 651-52 (Wash. Ct. App. 2003) (citing *Saunders v. Lloyd's of London*, 779 P.2d 249, 254 (Wash. 1989)). In order "for the insurer's decision to be voluntary, the insurer must have made a conscious decision to relinquish the right." *Id.* Moreover, "[t]he insurer's conduct . . . cannot be consistent with any interpretation other than intent to waive—any other reasonable explanation precludes applying waiver." *Id.* Here, Travelers' conduct after the fire is consistent with an explanation that Travelers did not intend to waive the Policy Release. The parties do not dispute that Travelers' adjuster learned of the existence of the Policy Release on June 10, 2008, the day after the fire. (*See* Brown Decl., Ex. 14.) In addition, Mr. Bronsink's own public adjuster, Mr. Khan, states that Mr. Brown first asked him about the Policy Release during their initial meeting on June 12, 2008, and continued to request information about the Policy Release in the following weeks and months. (Khan

ORDER- 14

Decl. ¶¶ 4, 5, 8, 9.) Furthermore, under Washington law, Travelers' investigation of the loss cannot constitute waiver of its defenses against coverage. RCW 48.18.470. The court therefore declines to find that Travelers waived the Policy Release.[7]

Fourth, Mr. Bronsink contends that summary judgment for Travelers is inappropriate because the doctrines of election and estoppel require Travelers to cover the Delft Square loss. (Bronsink Resp. at 7-9.) As the Washington Supreme Court has explained:

> The doctrine of election can apply where an insurer accepts a late premium payment and later discovers a claim for an accident occurring before the premium was tendered. Where the insurer has accepted such late payments for more than 1 year, it is put to an election: it must treat all late payments the same.

*Saunders*, 779 P.2d at 254. Meanwhile, in the insurance context,

> [t]he focus in estoppel must be on whether [the insured] justifiably relied on the insurers' practice of accepting late payments, delaying issuing the policy, and backdating coverage without notifying the insured of any gap in coverage or providing a refund.

*Id.* at 255. Mr. Bronsink asserts that Travelers had established a practice of renewing his policies after accepting his late premium payments, and that it cannot now refuse to renew his policy based on this most recent late payment. (*See* Lochte Dep. 46:5-47:20.) The court is not persuaded. Even assuming, without deciding, that Mr. Bronsink's election and estoppel arguments negate Travelers' contention that the Policy expired on

---

[7] Mr. Bronsink cross-moved for summary judgment on the ground of waiver. (Bronsink Resp. at 16-17.) Because the court finds, viewing the evidence in the light most favorable to Mr. Bronsink, that there was no waiver, the court denies Mr. Bronsink's cross-motion for summary judgment on this ground.

ORDER- 15

its own terms on June 1, 2008, the arguments do not help Mr. Bronsink overcome the effective Policy Release. There is no evidence in the record that Travelers established a practice of reinstating coverage after receiving a signed Policy Release from Mr. Bronsink or that Mr. Bronsink justifiably relied on such a practice.[8]

Finally, Mr. Bronsink contends that regardless of whether the Policy Release was effective, the Notice of Cancellation generated on June 11, 2008, constituted an offer to renew the insurance policy as of June 1, 2008, and that he accepted the offer to renew by paying the minimum due before July 1, 2008. (Bronsink Resp. at 17-19; *see also* Bronsink Mot. at 9-13.) Mr. Bronsink's argument fails because the Notice of Cancellation cannot be construed as a new offer to contract. Washington law provides that an insurer who cancels a policy for nonpayment of premium must deliver or mail a written notice of cancellation to the named insured at least 10 days before the effective date of cancellation. RCW 48.18.290(1)(a), (c). The Policy tracks the statute and provides that Travelers could "cancel this policy . . . by mailing or delivering to the first Named Insured and the first Named Insured's agent or broker written notice of cancellation, including the actual reason for the cancellation . . . at least 10 days before the effective date of cancellation if we cancel for nonpayment of premium." (Brown Decl., Ex. 1 at 11 ¶ A(2)(a).) Thus, the Notice of Cancellation simply provided the notice required by the statute and contract before Travelers could cancel the Policy, and

---

[8] Mr. Bronsink cross-moves for summary judgment based on the doctrine of election. (Bronsink Resp. at 7-8.) Because the court finds that the undisputed evidence does not support a finding of election, the court denies Mr. Bronsink's cross-motion for summary judgment on this ground.

provided for retroactive reinstatement of the Policy if Mr. Bronsink timely paid the premiums due. Because *Mr. Bronsink* had already exercised his option to cancel the Policy, however, there was no longer any policy left for *Travelers* to cancel, and the Notice of Cancellation had no operative effect.[9]

For the foregoing reasons, the court grants Travelers' motion for partial summary judgment. Because the court finds that Travelers is entitled to summary judgment on the ground that Mr. Bronsink cancelled the policy by signing the Policy Release, the court does not address Travelers' arguments that Mr. Bronsink failed to renew the policy in a timely manner, that the "known risk defense" precluded coverage for the fire, and that Mr. Bronsink violated the Policy's concealment provision. In addition, for the reasons explained above, the court denies Mr. Bronsink's motion for summary judgment and his cross-motions for summary judgment based on the doctrine of election and waiver. The court need not address Mr. Bronsink's cross-motion for summary judgment on the ground that the Policy renewed as a matter of law on June 1, 2008, because even if it did, Mr. Bronsink cancelled it that same day.

---

[9] Mr. Bronsink's motion for summary judgment relies upon this same argument. (*See* Bronsink Mot. at 9-13.) Because the court finds as a matter of law that the Notice of Cancellation was not an offer to renew, the court denies Mr. Bronsink's motion for summary judgment.

ORDER- 17

## III. CONCLUSION

For the foregoing reasons, the court GRANTS Travelers' motion for partial summary judgment (Dkt. # 15) and DENIES Mr. Bronsink's motion for summary judgment (Dkt. # 23) and cross-motions for summary judgment (Dkt. # 33).

Dated this 22nd day of December, 2009.

JAMES L. ROBART
United States District Judge

ORDER- 18